Case number 152457 Sierra Club v. United States Forest Service and Enbridge Energy Limited Partnership. Arguments not to exceed 15 minutes for the plaintiff and 15 minutes to be shared by the defendant and the intervening defendant. Ms. Dugan for the appellant. Thank You Your Honors. Mary Ann Dugan for the appellant Sierra Club and I have requested five minutes of rebuttal. As you know this is a federally approved project. It's a permit for a major oil pipeline that goes across federal the public's Forest Service land in Michigan as well as other areas of the country. It was first approved and installed 63 years ago. 46 years ago the National Environmental Policy Act was signed into law by President Nixon after Congress enacted it in part in response to the Santa Barbara oil spills. So this is the types of impacts we are concerned about are the very reason that that Congress even started thinking about the National Environmental Policy Act. Despite the lack of disclosure by the federal government as to the potential impacts of this pipeline being on public land, the plaintiffs have researched this and Enbridge has given some disclosure in the public in the public eye. We know that flow has increased. We don't know the exact amount but we do know that it the flow is regulated by a different agency than the Forest Service right? That's correct Your Honor. So we're not arguing that the the flow itself is what has been approved but what has been approved is the ongoing use of a pipeline across Forest Service land and the impacts, the scope and intensity of that use have increased dramatically. Ms. Duggan, could you, and I'm sure you're going to get to this, but could you just talk to me about why specifically you believe this project does not fall under, it's not covered rather by the categorical exclusion? Yes Your Honor. As you know the government has issued a series of categorical exclusions from NEPA which are to be narrowly interpreted because they are an exception to the broad purpose of disclosure to the public and the CE's categorical exclusions are to be used, they were developed for categories of projects that normally do not have significant environmental impacts. So here the Forest Service applied a CE that is for reissuance of a special use permit on public land where the only changes are administrative, there's no changes to the facilities or increase in scope or intensity. Here the, and so we could see this would be applicable for example if a building was constructed on Forest Service land and nothing changed as far as the impacts of that building. You said that this, I mean that the pipeline of course, this is not a new line going, I mean you had a line there before, so can you focus on why it doesn't apply? So if you had a building that was built on Forest Service land and originally that building contained just office furniture and then they start putting in toxic materials for example. Obviously there's a change in the scope and intensity of the use as, with regards to the potential environmental impacts. Here we know there's always been oil going through the pipeline so that's, it's not the material that's different but the volume is massive at this point. Given this other agency that regulates that, what's unfair about saying scope and use with pipelines is only going to be affected when there's enough volume that you've got to increase the size of the pipe. In other words, if you're not changing the structure of the pipe, why would NEPA cover it as opposed to the other agency? Well first of all, the other agency is not looking at impacts on this Forest Service land at any point. There is no NEPA analysis by any agency, no National Environmental Policy Act analysis of the impacts of this project running through the public's Forest Service land at this site. But that's in part because of essentially what's a grandfather provision, that this pipeline was built before NEPA was enacted. Correct. And the categorical exclusion and the other processes that are involved here allow for reissuance of permits and essentially that's what's going on here. So if Congress had wanted NEPA to apply to this kind of situation, Congress would have put that in the statute, wouldn't they have? Congress did not address grandfathering, at least at this, at this type of grandfathering when it wrote NEPA. What's it, what, so then there's the categorical exclusion. But as I said, that categorical exclusion only applies to a The fact that the, we can't see inside the pipe, so we don't know as we're looking at it, that it has increased, you know, dramatically over time, should not be relevant to your analysis. What's relevant is the change in the potential environmental impacts. The Enbridge, who now owns the pipeline, has had over 500 oil spills, I'm sorry, 800 oil spills between 1999 and 2010. That's all within a 10-year period, well, and, and the last permit was issued in 1992. So just since the last permit was issued, and it expired in 2012 and then was reissued, but since the last permit was issued, there's, there have been hundreds of oil spills. Has any of them been on this, involving this pipeline? No, but NEPA requires looking at the reasonable, reasonably foreseeable impacts, and the fact that there hasn't been a spill yet, thank goodness, on this particular piece of the public's land, should not allow the company to, and the government to escape from disclosing the potential impacts. The government has acknowledged that the new permit does not address the increased flow in any way. They have their business, that it's the business of the Department of Transportation and this acronym of something having to do with hazardous materials. That's not exactly correct. They have, they have said that that agency is looking at the impacts, but what they have said is because of this categorical exclusion, they won't, they don't have to look at the impacts. It's very common for two agencies to look at impacts from a project. It happens all the time. If this were a new pipeline through Forest Service land, the special-use permit would require a review of the impacts, even though other agencies are reviewing the impacts. If it were a new one, you'd have to do the assessment and you'd have to have the environmental impact statement and all of that, but it's not new. It's not new, but the categorical exclusion only applies if there's no increase in scope and intensity, and as we've argued, that there has been. I'm but does NEPA apply to this other agency? Well, that information is not in the record. We have not been shown any sort of environmental analysis or EIS. Well, I mean, I don't understand why you wouldn't know that. I mean, doesn't NEPA apply to all federal agencies? It does, but... So when this other agency says, gets a request, hey, I think we're going to up the volume, is it, is it the way to handle it when they get that request? The issue is whether NEPA applies to that request and you handle it that way. NEPA does apply at other levels, but there is not any site-specific evaluation of the impacts on this piece of Forest Service land. The network of pipelines is enormous. It goes all through Canada and over the Great Lakes, under the Great Lakes, throughout many states, and so... I guess I'm just wondering whether you're barking up the right tree. Why aren't you working with that agency? I mean, the bigger the network, the more it seems to me you ought to be very careful about their complying with NEPA. My clients are working at every level to scrutinize what's going on. You are, you are doing that? Not me, but my client, yes. Yes, absolutely. But it's similar, Your Honor, to a situation where the Forest Service writes their 10-year forest plan for an enormous forest, the Superior National Forest, for example, and they say over the next 10 years we expect to log X number of acres and, you know, we're going to take care of these areas for species and so on. They still have to, and they do NEPA for that. Then, when they do a specific timber sale, they have to also do NEPA for that site. Here, the pipeline, because it was built before NEPA, that site-specific analysis was never done, and that would be legal under the categorical exclusion if there was no change in scope and intensity. The secondary issue, of course, is that the permit is not transferable and it is now owned by Enbridge, so it is not really just a reissuance of the permit. One question, you've been talking about the potential environmental impact, but my understanding from the record is that the focus of the environmental impact was on a specific bird, the Kirtland's warbler. Is there any other environmental impact that you want to point us to that we should be aware of? The Kirtland's warbler issue is a specific issue because it is an endangered species and so that's a special category within NEPA. However, there are obviously other impacts when there's oil that spills into the public's land and waters. The fact that there was no NEPA means we haven't had an analysis of what these impacts are, but certainly most Americans know that when oil goes into the water, there are going to be impacts. I see that I'm out of time. Thank you. Thank you. Good morning, Your Honors. May it please the Court. My name is Lane McFadden. I represent the United States Department of Agriculture Forest Service. With me at council table is Mr. David Coburn on behalf of Enbridge Energy Limited Partnership, LLC, and he'll be using five minutes of our combined argument time today. The categorical exclusion that the Forest Service applied, which is found at 36 CFR 220.6E15, applies unless there is a change to the scope or intensity of authorized activities, and that really is the phrase that governs whether this categorical exclusion applied to this decision. It did because the Forest Service didn't change what Enbridge is authorized by the Forest Service to do on its right-of-way or where it's authorized to do it. So you're saying that this increased flow that Ms. Stugan referenced and is referenced by the record, that would be within the original scope of what the prior owner was allocated or approved to do? That's right, Your Honor. I mean, there are name changes notwithstanding. They're the same owner, but it's... But I'm talking about the flow amount now, because you talked about the scope and intensity, and she seemed to suggest that this increased, I think she's described it as a massive increase in flow, would be a change in scope and intensity. Right. I think that the dispute here is, she suggested it's a change in the scope or perhaps, I don't know, use or amount of oil. It's a physical change. It's not a change in the authorized activities, which is the language of the categorical exclusion itself. The Forest Service, as this Court recognized, doesn't regulate the flow or a quantity of oil inside the pipeline, which the Sierra Club conceded here today. The risks go up if more oil is going through the pipeline. I mean, pressure goes up, and if there's a leak, the consequences of the leak go up. So I'm just interested in making sure that someone gets regulated. And if you don't get regulated on this, fine, but can you admit on behalf of the government that NEPA would apply to the increased flow when it comes to this other agency? Well, certainly NEPA applies to the Pipeline and Hazardous Safety Materials Administration's decision to approve... Do they approve? Does Enbridge have to go to them and say, hey, we're increasing the volume this year by five percent, ten percent, and then they have to approve, and then when they approve it, that triggers NEPA? Right, so let me walk through that to be sure I'm very clear about my answer to that. Yes, at any time the pressure or flow in the pipe increases, they have to go to this sub-agency of the Department of Transportation for approval, and prior to getting that approval, they have to test the pipeline. They conduct a hydrostatic pressure test, which is explained in asking the Forest Service to renew the authorization for this pipeline. But when they go to PIMSA, or however you pronounce it, do they have to get a NEPA analysis, or is there some other analysis that PIMSA is doing? So the Enbridge has to test the pipeline to the satisfaction of the agency, and they have to provide an oil response plan, which governs what would happen if there was an oil spill, and how Enbridge would react and clean it up, and all of that is applies. But the question of how much NEPA analysis is to be done is one that I can't answer definitively. It depends just as with every other agency action on whether it's likely to significantly affect the human environment. Can you answer it this way, that Sierra Club could do the exact same thing they're doing with what you did, I mean they just come in, it's the same NEPA rules, and they ask for whatever they can get, and if the agency is allowed to say, well we don't need it because we've already checked, the point is the same process would apply to that decision as it applied to your decision. They're welcome to bring an APA suit against PIMSA for any approval that PIMSA issues to Enbridge for the increase in pressure flow and if oil in its pipeline, or the way that it approves Enbridge's compliance with ongoing regulations. It has the annual and more, well less, it has a number of requirements it has to meet at repeated intervals to, you know, inspect the integrity of its pipeline, to want to point out the administrative record here does reflect that the Forest Service did go to PIMSA because they were getting comments from the Sierra Club and from other concerned entities about whether this pipeline was still safe. It's been in the ground for a while. The Forest Service asked the Department of Transportation's agency whether there was any concern and the answer was no, that there had been never an indication of a violation along this pipeline. PIMSA did say that they don't issue you're doing a good job letters, so there's nothing in the administrative record to suggest that, you know, there's no documentation that they're doing a good job. What you have is an absence of documentation. They're not doing well. There wasn't an enforcement action. No concern from the agency who writes the regulations governing exactly how much pressure and flow can be in pipelines based on what their material is and how thick they are. And absent... Is this in the record, you say? Yes, your honor. Where, I mean, you don't have to give me a page, but what kind of a document is it in? There's a, there's an exchange of email correspondence between Forest Service employees and employees of PIMSA that we, I don't have the record sites here, but they are in our brief, that discussed this very thing and then they were provided to the commenters, including the Sierra Club, because they, we asked because they they had asked it of us and the Forest Service quite correctly said that's outside the scope of our regulatory authority and our expertise, but the letters sent back to the commenters said, if you have further concerns about this particular issue, here's the contact information for PIMSA and that is the agency to whom you should go to ask what they are doing when they regulate this pipeline. My understanding is that Enbridge or its predecessor installed certain safety equipment. Was that at the behest of the Forest Service or at the behest of PIMSA or a voluntary thing? It was, it was voluntary. It was approved by the Forest Service. They had to get special use authorization to do that. There are remote, there are sort of remote control shutoff valves at either end of the stretch of the pipeline that's on the Forest Service land, so that if there ever is indication of an incident, Enbridge can shut it off remotely, which they can do much more quickly than having to actually drive out there. So those were amendments to one of the permits that was issued by the Forest Service? That's right. And the last time the permit was issued was what year? The permit itself was issued in 1992. Then there was an administrative change to reflect the name change in 2002. So the issue before you today is a renewal of that 1992 permit, a reauthorization of that for another 30 years. I think that hopefully answers the question about the scope of the questions. I will let my co-counsel or counsel for Enbridge take the rest of our time. Thank you. Good morning, Your Honor. It's David Coburn for Enbridge Energy Limited Partnership. The Sierra Club in this case is endeavoring to state a case that's simply not supported by the facts of the law, as I think your questions illustrate. Its goal appears to be to expand the boundaries of intensive EIS-type environmental review to a setting where it simply would serve no purpose. Isn't it troubling that there never was a NEPA-type analysis because NEPA was enacted after the pipeline was built? I don't think it should be troubling to this Court, Your Honor. There are hundreds, if not thousands, I'm sure it's in fact it's thousands of miles of pipelines in this country. There are highways in this country. There are rivers that were constructed before NEPA was enacted and they've never undergone NEPA review because the law simply doesn't require it. If there's a significant change, if we were rerouting the pipeline, if we were installing a pipeline with a larger diameter, then in this case the Forest Service would probably have to undertake an environmental impact statement. But that's not what has happened. The same pipeline has been in the ground and nothing is changing. What about the concern that Ms. Dugan raises about the number of spills? I believe she said nine or ten spills and not from this particular pipe but from I believe your company or your predecessor that there have been these spills and should that, since there has been no NEPA analysis, shouldn't that concern be one that suggests some impact statement ought to be done? Oil spills are a concern of the Pipeline and Hazardous Materials Safety Administration, PHMSA, the arm of DOT that regulates pipeline safety. They have extensive regulations that are designed to prevent spills, inhibit spills and Enbridge follows those regulations. It is subject to those intensive regulations. It put in the emergency remote controlled valves around the river in this forest in order to make sure that if there were a spill it would not affect the river. It takes dozens of other actions routinely to make sure the pipelines don't spill. Does that do a NEPA analysis in terms of the whole environmental impact? A NEPA analysis is designed to inform an agency of the environmental impacts of that agency's action. So here the Forest Service was simply renewing a permit for a pipeline that was in the ground for 30 years. This agency knows some experience and therefore it adopted this categorical exclusion that renewal of a permit doesn't have environmental impacts. What about when PHMSA approves greater volume? Does NEPA applies then? PHMSA, as my colleague said, PHMSA undertakes extensive safety analysis. Our targeted question is does it do NEPA analysis? Because PHMSA I'm assuming is really concerned about spills. Right. It typically does not do an EIS when a pipeline company increases the volume of flow. Changing the volume of flow is something that happens with time. Sometimes the volume is reduced. Sometimes the volume is increased. But just to be from my perspective a little more precise, I don't much care whether they do an EIS. Sometimes, never, always. What I care about is whether NEPA applies to those decisions. And it does apply. It's just a question of how it applies and what they do. Am I right about that? Because NEPA applies to everybody. NEPA applies to decisions other than certain categories of decisions that are in this case it is PHMSA's viewpoint. And this is being challenged, by the way, in a case recently filed in Michigan, in the Federal District Court in Michigan. But NEPA takes the position that when it approves an emergency response plan that that action does not require it to undertake any kind of extensive NEPA review. Whether it does any kind of NEPA review I'm not sure. Which agency is this that you're talking about? That's PHMSA. That's PHMSA. That's PHMSA. That you're saying is being litigated in another case? It's being litigated in another case. There are some decisions out there, and I believe they're cited in our brief, that indicate that that kind of activity by PHMSA is not subject to a requirement for complete NEPA review. What about the argument that's made by the Sierra Club that Enbridge is not the entity that got the initial permit? It was known by a different name, but it's the same company. It is simply a name change as opposed to any other change? It is just a change in name. In fact, this group of pipelines that traverses through Michigan is still known as the Lakehead Pipelines, but they are operated by a company now named Enbridge Energy Limited Partnership, which is my client. How long do these pipelines last? They can last indefinitely, because what happens is that they Nothing's indefinite. Like sewers. Water. Sections of the pipeline are replaced. Sometimes when the cost of maintaining the pipeline through digging out sections that need replacement exceeds the cost of that digging, then the entire pipeline is replaced. That does happen. But I can't give you a finite period within which we know that this pipeline will require replacement. Segments of it have been replaced. Is this pipeline underground through the whole of the forest, this 8.1? It is underground its entire length from northern Michigan over to Canada. If there are no more questions, Your Honor, thank you. Thank you. Thank you. I'd like to point the Court to page 27 of our opening brief, which does have a citation to the record, Case ID 11-27-28, where the Forest Service conveyed responses from the Department of Transportation to the public's concerns. One question was, if the pipe cracks and there's an automatic shutoff, a considerable amount of oil will spill. How much spill is likely? The answer was, this will depend on how much oil is in the pipe at the time and how big the hole-slash-crack is, period. That's the end of that answer. Another answer to another question was, the comment from DOT was, there is no set number of years for replacement. It depends on the materials used in construction of the pipe. It could last five years. It could last much longer. They don't know when or if they need to replace it. It could be many years. This is the type of analysis that is being done. We don't know. It will be at some point. If nothing else, there are going to be impacts from construction when they replace the segments. None of that has been analyzed. Suppose they were going to be replacing the pipe. Would that be something that would be covered by the categorical exclusion, or would that be something that could trigger an EA or an EIS? As I understand it from the record, there is no trigger for any further analysis. The permit allows Enbridge to not only have its pipe on the public's land, but to maintain it, so to replace segments of it, to put in shutoff valves and so on. And none of that is analyzed at any point, except at the time the permit is issued. Okay, but the particular environmental impact that your group has alleged is this impact on the Kirtland's Warbler. My understanding is that there was a particular arrangement that was made, which was that there wouldn't be any digging or fooling around with a pipeline during the special season when the Kirtland's Warbler was in this forest. So hasn't there been the kind of protection that you need? The Kirtland's Warbler is only one of the impacts that my clients have expressed concern about. The concern has been primarily about the potential for spills, since there have actually been 804 spills in a 10-year period on Enbridge's lines alone. And the spills would impact fish, would impact the soils and what's underground on our land, trees. There's all kinds of impacts that happen from spills. Judge Sutton, you were concerned about whether at some point this is regulated, and it's important to – I wanted to make the distinction that NEPA is not about regulation. It's about disclosure to the public and the decision-maker about the site-specific impacts. And again, it's very analogous to a timber sale within a larger forest plan. The Enbridge's attorney said we're asking for intensive EIS-type review, but I wanted to also note there is a second step between – an intermediary step between a categorical exclusion and a full environmental impact statement, which is an environmental analysis. And that is done to – environmental assessment, excuse me, to determine whether there may be significant impacts. And not even that brief analysis has been done here, only a categorical exclusion. Also, there is an exception, even where a categorical exclusion clearly applies, and we don't concede it applies – even applies here, because there's a change in scope and intensity. Even if it did apply, the government is not allowed to use a categorical exclusion if there may be extraordinary impacts or extraordinary circumstances. And we submit, Your Honors, that the fact that Enbridge is running this pipeline and has, under its watch, had the largest inland oil spill in history, over a million gallons spilled into the Kalamazoo River, that we are now learning that there are extraordinary circumstances when there is a pipeline running underground. This pipeline also goes through the Mackinac Channel, which is – separates the upper and lower peninsulas of Michigan and over – under the Great Lakes, so that – That part is not in front of us, because this is only involving the Forest Service and this 8-mile segment. That's correct, Your Honor. And so, at this site that we're talking about, there is the Osobel River, which is a very well-known fly-fishing spot. So every area where this pipeline goes through needs to be analyzed as to the impacts. Now, where it goes through private land, there's no requirement of NEPA analysis. But where they're getting a permit to go on the public's federal land, NEPA applies. Thank you, Your Honors. Thank you. Thank you all for your argument. The case will be submitted. And would the clerk call the next case, please.